UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KURT RENFRO,
WILLIAM SOUTHWORTH,
RICHARD PETERSON, and
JAMES FITCHUK, individually
and as Class Representatives on
behalf of other persons similarly
situated,

      Plaintiffs,                                    Case No. 1:99-cv-877

v                                                Hon. Wendell A. Miles

INDIANA MICHIGAN POWER
COMPANY,
d/b/a AMERICAN ELECTRIC POWER,

      Defendant.
_____/

OPINION AND ORDER ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT

The named plaintiffs, acting on behalf of both themselves and other similarly situated persons, have filed this action against their employer, Indiana Michigan Power Company, d/b/a American Electric Power ("AEP" or "the company"), alleging violations of the overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* The matter came before the court on the following motions: (1) AEP's Motion for Summary Judgment as to Technical Writers and Nuclear Specialists (docket no. 240), and (2) Plaintiffs' Motion for Partial Summary Judgment (docket no. 259).

For the reasons to follow, the court grants each motion in part and denies each in part.

<u>I</u>

All of the plaintiffs in this action are, or were at relevant times, employees of AEP, working at its Donald C. Cook Nuclear Plant (the "plant" or the "Cook plant") located in Bridgman, Michigan.  The Cook plant was built and designed as a nuclear powered generating station providing power to customers in Michigan, Indiana, and other locations.

The parties' current motions address those plaintiffs who either are or were at relevant times employed at the Cook plant as "technical writers" or "nuclear specialists."  The complaint alleges that named plaintiff William Southworth is a technical writer in the Maintenance Department at the plant.  In this position, the complaint further alleges, Southworth "is generally responsible for writing procedures relating to the planning and performance of maintenance work on equipment at the Cook Plant that is designed to produce and generate nuclear power."  Complaint at 3, ¶ 15.  The complaint also alleges that named plaintiff James Fitchuk is a senior nuclear specialist in the Plant Engineering Department at the plant.  In this position, the complaint further alleges, Fitchuk "is generally responsible for retrieving and providing information to support production of nuclear power and maintenance of the equipment at the Cook Plant."  <u>Id</u>. at 4, ¶ 17.  The complaint also alleges that the claims of the named plaintiffs are "typical" of the claims of all past or current AEP employees employed as technical writers or nuclear specialists in either the Maintenance or Plant Engineering Departments at the plant.  <u>Id</u>. at 7, ¶s 37(b),(c), 38.[1]

---

[1]In addition to Southworth, the following remaining plaintiffs in this action either are or were technical writers:  Lloyd Dopp, Edward Jones, and Robert Piehl.  Plaintiff Barbara Hoepner has been substituted for Steve Hoepner, a former technical writer who is now deceased.

In addition to Fitchuk, the following remaining plaintiffs in this action either are or were

(continued...)

According to plaintiffs, the technical writers

write, revise, and review procedures, which AEP's craft workers (mechanics, welders, electricians, and instrumentation and control ('I&C') technicians) use to maintain the plant's equipment.  The Technical Writers get the technical information for the procedures from source documents, such as vendor manuals, plant drawings, AEP's design specifications for the plant, other existing procedures, and other groups at the Cook plant (usually, the design engineers), and from the Technical Writers' past experience as craft workers.  The Technical Writers take this information and insert it into AEP's procedure template, which dictates the procedure's format and style.

Plaintiffs' Revised Response to Defendant's Motion for Partial Summary Judgment at 4

(footnotes omitted).

The job description for a technical writer employed in the maintenance department at the

Cook plant provides in pertinent part as follows:

I.      FUNCTION

The Technical Writer reports to the Procedure Supervisor and is responsible for the development, writing, editing, review and maintenance of Maintenance Department procedures.

II.     RESPONSIBILITY AND AUTHORITY

1       Write and develop new procedures and changes to existing procedures as assigned.

2       Review plant documents as assigned for impact on established procedures.

3       Review plant commitments as assigned for impact on established procedures.

4       Maintain associated procedure databases and records.

---

[1](...continued)
nuclear specialists:  Thomas Brown, John Hylok, David Kosonovich, James Murtha, James Parker, and Dale Post.

5      Perform other procedure-related duties as assigned by the Procedure Supervisor.

6      Coordinate with other departments, organizations, etc. to ensure smooth plant operation.

7      Review procedure changes to ensure consistent and quality products.

8      Adhere to all radiological control work practices within the assigned area of responsibility, as well as all contamination control program requirements.

9      Perform all duties and work with other employees in a safe manner, in compliance with all appropriate company safety policies and rules.

10     Carry out within the assigned area of responsibility the company's program of Equal Employment Opportunity.

11     Undertake other responsibilities as assigned by proper authority.

* * *

V.    <u>SCOPE DATA AND ACCOUNTABILITY</u>

The Technical Writer has a direct influence on the quality of maintenance performed at the Cook Nuclear Plant. Quality maintenance is required to ensure that an installed investment exceeding one billion dollars is maintained in a safe, efficient, and reliable manner. Failure to adequately perform this function has the potential for increasing Regulatory oversight and subsequent fines, as well as increasing the number of personnel injuries, and equipment damage.

VI.   <u>OTHER CONSIDERATIONS AND REMARKS</u>

A.    The incumbent must have the ability to interpret technical subject matter and express it coherently in writing in unambiguous terms.

B.    The duties of the Technical Writer may include exposure to ionizing radiation within the limits set forth in the Code of

4

Federal Regulations.

C.     The incumbent is expected to schedule time and efforts in the most efficient manner in order to assure that Maintenance Department procedural needs are met.

D.     Travel may be required to accomplish and fulfill the direct responsibilities and authorities listed in Section II.

E.     The incumbent may be required to work rotating shift schedules to support plant operations and commitments.

Appendix to Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Appendix"), Exhibit A.

According to a declaration submitted by Southworth (attached as Exhibit 2 to Plaintiff's Revised Response to Defendant's Motion), the procedures he writes, revises, and reviews are technical procedures and – occasionally – test procedures. These procedures are generally electrical procedures and – occasionally – mechanical procedures. Southworth states that maintenance department electricians and mechanics use these procedures to perform maintenance activities at the plant. Southworth also describes how the plant has extensive written guidelines which dictate virtually all aspects of procedure writing, including requirements for structure, format, and style.

Plaintiff Lloyd Dopp is also a technical writer. Dopp, who has a Bachelor of Science degree in electrical engineering, specializes principally in writing (or reviewing) procedures for the maintenance of electrical equipment. Defendant's Appendix, Exhibit M, at 16-19, 55. During his deposition, Dopp described his work as providing technical support for the maintenance group, giving them "important instructions on how to do their work and guidelines." Id. at 145. According to Dopp, he provides the electricians "with work instructions that are easy to follow to

5

perform their job more efficiently." Id. at 158.

Plaintiff Robert Piehl is another technical writer employed at the Cook plant. Piehl, however, states that he is not a procedure writer, but instead spends his time either responding to or screening and categorizing "condition reports" involving problems in the field at the plant. Defendant's Appendix, Exhibit T, at 19, 27-29. The basic purpose of a condition report, according to Piehl, is to "identify things that need to be looked at." Id. at 31. Piehl described his work product as "mental piecework." Id. at 33. Piehl agreed with the statement that the purpose of this work "is so that you have a record of things that are taking place in the plant and it can be looked at for purposes of trends and spotting problems and the like[.]" Id. at 35.

In contrast with the work of the technical writers, the work of the nuclear specialists is, according to plaintiffs,

> a little more varied and their duties, though similar in process, can be divided into two categories. Some of the Nuclear Specialists (Hylok, James Murtha, Thomas Brown, James Parker, and Dale Post) perform some or all of the following tasks: engineering evaluations, equivalency evaluations, condition report actions; and procedure reviews. Other Nuclear Specialists, specifically, Fitchuk and David Kosonovich, perform tasks related to inspection programs, although some of their tasks are similar to the other Nuclear Specialists.

Plaintiffs' Revised Response at 6-7. According to the position description "matrix" for Nuclear Engineering, Nuclear Specialist, there are several different "levels" for the position, ranging from "Entry Level" to "Advanced Level." All levels of the position require technical knowledge of varying degrees. Defendant's Appendix, Exhibit B.

In his declaration (attached as Exhibit 9 to Plaintiff's Revised Response to Defendant's Motion), nuclear specialist plaintiff James Fitchuk states that he has spent the majority of his work time over the past several years on the plant's containment inservice inspection program

6

and its "snubber" program.  The containment inservice inspection program involves inspecting the concrete wall and steel liner that acts as a barrier around the plant's nuclear reactor.  The "snubber" program, in contrast, involves inspecting, testing, and maintaining "snubbers," which are shock absorber-like apparatuses around pipes to protect the pipes from, for instance, seismic activity.  Although the applications are different for these two programs, the tasks which Fitchuk performs for both are generally similar.  Specifically, his principal program-related duties include scheduling inspections; reviewing and/or revising program procedures; reviewing reports of inspection results; initiating condition reports where inspection results fail to met established acceptance criteria or where acceptance criteria are not specified; summarizing inspection results and corrective actions taken pursuant to condition reports; entering the data into the plant's computer system; and miscellaneous field activities (the latter comprising perhaps 20 percent of Fitchuk's total work time).

Plaintiff John Hylok is also employed as a nuclear specialist at the Cook plant. According to his Declaration (attached as Exhibit 7 to Plaintiff's Revised Response to Defendant's Motion), he spent his work time during the years 1997 to 2000 as follows: 20 percent preparing engineering evaluations, 50 percent preparing condition reports, and 30 percent on procedure reviews.  Since 2000, he has continued to spend 20 percent of his time preparing engineering evaluations, although he now spends less time on condition reports – 40 percent – and more time on procedure reviews – 40 percent.

Hylok stresses that his job involves reviewing sources to glean the correct information, as opposed to formulating his own answers to problems.  Therefore, according to Hylok, any variations between his work product and that of any other nuclear specialist assigned the same

7

task should be on matters of style and not substance.

Hylok states that the need for engineering evaluations arises for one of three reasons. The first situation is where someone does not know how to proceed with a particular task because they do not know the applicable acceptance criteria, acceptable replacement part, or specifications related to instrumentation on which they are working. The second situation arises where someone has requested an equivalency evaluation not associated with a condition report. The third situation is presented where someone has questions about a non-design change modification to the plant.

According to Hylok, if the problem is that someone does not know how to proceed with a particular task, Hylok's job as a nuclear specialist is to find the applicable information or, if he cannot, to refer the matter to a design engineer. In contrast, an equivalency evaluation is necessary when AEP wants or needs to replace a particular part with a part that is not identical. Hylok's job in this instance is to review source documents and find the criteria required of the original part and, in turn, find all available replacement parts which meet these requirements. If Hylok is unable to find a part which meets the requirements, once again, he refers the matter to a design engineer.

Hylok describes condition reports as sometimes involving equivalency evaluations. Other condition reports on which he works, however, require identification of the "root-cause" of a particular adverse condition at the plant; identification of the "apparent cause" of such a condition; or creation of a permanent record describing the condition. A final type of condition report described by Hylok involves conditions not adverse to quality which have no impact on safety related equipment or personnel safety. The majority of Hylok's work involves the

8

apparent-causes and the creation of permanent records.  Apparent-cause condition reports typically involve reviewing plant design plans to locate where a particular part, which has been identified as malfunctioning or defective, is in use elsewhere in the plant.  Condition reports requiring the creation of permanent records involve broken parts for which no defect or malfunction is identified.  The purpose of the report is for "trending"; in other words, if similar conditions are noted with unusually high frequency, then a "root-cause" report might need to be initiated.

Hylok also states that he performs reviews of procedures written for use by the I&C technicians.  These procedures involve either surveillance (the periodic checking of instruments to determine their accuracy) or calibration (correction of inaccuracies in instruments).  In reviewing a new procedure, Hylok's tasks include ensuring that the procedure's purpose is adequately covered and that the sequence of activities is logical; editing the text for style, and spelling and grammatical errors; and verifying the accuracy of the procedure's technical information.  If the procedure meets the review requirements, Hylok essentially signs off on it; if not, then he returns it to the procedure writer for corrections.

Plaintiff Thomas Brown is also employed as a nuclear specialist.  During his deposition, Brown testified that he works "as an industrial engineer[.]" Defendant's Appendix, Exhibit L, at 16.  Brown also testified that because he felt he was doing the work of an engineer, he at one point expressed concern that "degreed engineers" at the plant were making more money than he was.  (Brown holds a Bachelor of Science degree, but not in engineering.) Id. at 149-150, 16-17. Three other nuclear specialists, John Hylok, David Kosonovich, and James Murtha, testified that the work they perform is similar to that performed by degreed engineers.  Defendant's Appendix,

Exhibit O, at 29; Defendant's Appendix, Exhibit Q, at 58, 101; Exhibit R, at 45.  In fact, Hylok testified that previously, his job title was "engineer," and although that title was changed to "nuclear specialist," his job duties did not change.  Exhibit O at 85.  Kosonovich, who is a degreed engineer, agreed that his job at the plant "was the equivalent of a lead engineer position[,]" even though he "didn't have the title."  Exhibit Q at 101.  Murtha testified similarly that his former job title was "performance engineer"; subsequently, that title was changed to "nuclear specialists" for "titled engineers that didn't have degrees[.]" Exhibit R at 6, 45.

The evidence regarding plaintiffs' pay generally indicates that they are well-compensated. Plaintiff Brown testified that when he was hired by the company in 1990, he received a starting salary of $ 3,100 per month; he presumably earns even more now.  Defendant's Appendix, Exhibit L, at 85.  Plaintiff Dopp testified that he earned an annual salary of $ 62,500 as of June, 2001, when his deposition was taken.  Id, Exhibit M, at 16.  Plaintiff James Fitchuk testified that his base salary during the calendar year 1999 was $ 64,850, although he earned a total of $ 72,000.  Id., Exhibit N, at 17.  Plaintiff John Hylok testified that his salary has increased each year; during 2002, the year his deposition was taken, he was earning approximately $ 84,000 (presumably annually).  Id., Exhibit 0, at 13.  Plaintiff David Kosonovich testified that his salary at the time he left his employment at the plant was in the mid-$ 70,000 range.  Id., Exhibit Q, at 46-47.  Plaintiff James Murtha testified that his rate of pay when he began his employment with the company in 1991 was $ 3,750 per month; presumably that has increased since that time.  Id., Exhibit R, at 93.  Plaintiff James Parker testified that he earned a salary of $ 73,000 as of April, 2001, when his deposition was taken.  Id., Exhibit S, at 16.  Plaintiff Piehl was earning $ 70,000 annually at the time of his deposition in June, 2002.  Id., Exhibit T, at 146-147.

## II

The FLSA makes it unlawful for a covered employer to employ an individual "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess [of 40 hours] at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Plaintiffs allege that AEP willfully violated section 207(a) by failing to pay them overtime wages in accordance with that provision and by classifying them as "exempt" employees under the statute.  Although the FLSA exempts from the overtime pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a), plaintiffs allege that AEP has improperly classified them as exempt under section 213(a).  Plaintiffs seek recovery of the amounts by which they were allegedly underpaid, as well as liquidated damages and attorneys' fees.  They also seek injunctive relief under 29 U.S.C. § 217, restraining AEP from any further violation of the FLSA.

## III

In its motion, AEP seeks summary judgment in its favor on the technical writers' and nuclear specialists' claims for unpaid overtime.  In their own motion, the plaintiffs who are or were employed in these capacities seek summary judgment in their favor on the issue of AEP's liability to them for unpaid overtime under the FLSA.  Plaintiffs also seek summary judgment in their favor on certain of AEP's affirmative defenses, including good faith; latches; waiver and estoppel; failure to mitigate; and failure to exhaust administrative remedies.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986).  A disputed factual issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).   However, reasonable factual inferences are one thing, and legal conclusions are another.  It is the applicable substantive law governing the issue which determines what facts are relevant.

The exemptions to the FLSA's overtime provisions are to be narrowly construed against an employer who invokes them, and the employer bears not only the burden of proving that an employee falls within an FLSA exemption, but also the burden on each element of the claimed exemption.  Martin v. Indiana Michigan Power Co., 381 F.3d 574, 578 (6th Cir. 2004).  Plaintiffs

argue that an employer must meet its burden by establishing exempt status through "clear and affirmative evidence." Ale v. Tennessee Valley Authority, 269 F.3d 680, 691 n.4 (6th Cir. 2001) ("The defendant must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption"). However, although plaintiffs cite to a footnote in Ale and a limited number of other cases which utilize the phrase "clear and affirmative" or some variation of it, they have identified no persuasive origin for this purported heightened burden. Moreover, in a more recent case, a Sixth Circuit panel declined to expound on Ale's use of the phrase "clear and affirmative" evidence. Martin, 381 F.3d at 578 n.1 ("Since the meaning of the phrase would not change the result in this case, any exposition by us on the intentions of the Ale court would be mere dicta").

In the absence of persuasive reasons for applying a heightened standard, the court declines to do so. As the Supreme Court has stated,

> Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'

Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 659 (1991). Although an intermediate standard of proof, which typically employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is "no stranger to the civil law," the interests at stake in cases where the standard is employed "are deemed to be more substantial than mere loss of money," such as where reputation or liberty are in jeopardy. Addington v. Texas, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808 (1979) (citations omitted); see also Cooper v. Oklahoma, 517 U.S. 348, 362-363, 116 S.Ct. 1373, 1381 (1996). Here, while the FLSA clearly has a remedial purpose and its exemptions must therefore be narrowly construed, it is unclear why plaintiffs believe that the

statute's purposes are not adequately served by the long-recognized practice of shifting the burden of proof respecting exemptions to the employer.  Placing the burden of establishing the defense of exemption on the employer fully protects employees' interests, and it seems certain that if Congress had intended to impose standards higher than those traditionally used in civil matters such as this, it would have clearly done so.  Given the absence of a persuasive reason for doing so, the court declines to hold AEP to a heightened burden on the issue of exemption.

"FLSA claims typically involve complex mixed questions of fact and law."  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S.Ct. 1437, 1446 (1981).  While the question of how employees spend their working time is a question of fact, the question whether their particular activities exclude them from the overtime benefits of the FLSA is a question of law.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 1530 (1986); see Reich v. State of Wyoming, 993 F.2d 739, 741 (10th Cir. 1993) (question of how game wardens spend their time is question of fact); Dalheim v. KDFW-TV, 918 F.2d 1220, 1226 (5th Cir. 1990) ("the ultimate determination of whether an employee is exempt" is "properly characterized as a conclusion of law," even though "based on both historical fact and factual inferences"); see Ale, 269 F.3d at 691 ("ultimate question" of whether employee is exempt is a question of law).

Although both plaintiffs and AEP have moved for summary judgment, this does not relieve the court of its responsibility to consider each motion in light of the theories respectively advanced by the parties.  See Bienkowski v. Northeastern University, 285 F.3d 138, 140 (1st Cir. 2002) ("The standards are the same where, as here, both parties have moved for summary judgment.  ‹The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard'") (citation omitted); Promac, Inc. v. West, 203 F.3d 786, 788 (Fed. Cir. 2000) ("When

14

both parties move for summary judgment, each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is under consideration"). However, the court's task is somewhat easier here, where the principal theories advanced by the parties are opposite sides of the same issue: applicability of a particular exemption. Each side has contended that no genuine issue of material fact remains. Because AEP bears the burden of proof, if it fails to create a genuine issue of material fact on each element of the claimed exemption, then the court must grant summary judgment for the plaintiff employee. Martin, 381 F.3d at 578.

## IV

In their motion, the plaintiffs argue that they are not exempt employees, while in its motion AEP argues that the plaintiffs are exempt "administrative" employees. In the case of the nuclear specialists, AEP argues that these plaintiffs also fall within the exemption for "professional" employees.[2]

The FLSA provides that the overtime pay requirement "shall not apply with respect to ... any employee employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). FLSA exemptions "are to be narrowly construed against the employers seeking to assert them[.]" Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456 (1960). The Secretary of Labor has promulgated final regulations which supply standards for determining the applicability of the exemptions at issue. These final regulations, which appear at

---

[2]AEP does not dispute that the plaintiffs have worked in excess of 40 hours in many work weeks during the relevant time period, without being paid overtime at 1½ times their hourly rate as required under 29 U.S.C. § 207(a)(1). AEP has, therefore, violated the FLSA unless it can prove that these plaintiffs are exempt employees.

Part 541 of Title 29 of the Code of Federal Regulations, took effect only recently and update

previous regulations in effect at the time plaintiffs filed this action.  Effective August 23, 2004,

the new text doe not alter the outcome of this case.  See Defining and Delimiting the Exemptions

for Executive, Administrative, Professional, Computer and Outside Sales Employees, 69 Fed.

Reg. 22122 (April 23, 2004) (codified at 29 C.F.R. pt. 541, Nt.).  The court's citations to Part

541 herein shall refer to the amended text, published at the conclusion of the former text, at 29

C.F.R. pt. 541, Nt.


## A

## Administrative Exemption

The general rule for administrative employees appears at 29 C.F.R. § 541.200, Nt.  Under

that section, plaintiffs may qualify for the administrative exemption provided they are paid at a

rate of not less than $455 per week.  29 C.F.R. § 541.200(a)(1), Nt.  This would be the equivalent

of an annual salary of $ 23,660.  There appears to be no reasonable dispute that plaintiffs, who

are well-compensated, are paid in excess of this amount.

The question, therefore, is whether AEP can satisfy the test specified by the regulations

for administrative employees, which requires the company to prove (1)  that it paid the plaintiffs

on a salary or fee basis; (2) that plaintiffs' primary job duties consisted of the performance of

office or non-manual work directly related to the management or general business operations of

the employer or the employer's customers; and (3) plaintiffs' primary duties include work

requiring the exercise of discretion and independent judgment with respect to matters of

significance.  29 C.F.R. § 541.200(a), Nt.[3]  The court applies the requirements of this test below.

### 1.      Salary basis

Regarding the first element of the test for administrative exemption, 29 C.F.R. §

541.602(a), Nt. expressly provides that an employee "will be considered to be paid 'on a salary

basis' within the meaning of [the] regulations if the employee regularly receives each pay period

... a predetermined amount constituting all or part of [his] compensation, which amount is not

subject to reduction because of variations in the quality or quantity of the work performed."

Plaintiffs do not dispute that they are paid on a salary basis, and the evidence clearly shows that

plaintiffs are salaried employees.  The court therefore concludes that  AEP has met its burden of

showing that no genuine issue of fact remains regarding whether the plaintiffs are salaried

employees within the meaning of the regulations.

### 2.      Office or Nonmanual Work Directly Related to General
###          Business Operations - Primary Duty

Satisfaction of its burden on the second element of the test for administrative exemption

requires AEP to show that plaintiffs' primary job duties consist of office or non-manual work and

that such duties relate either to AEP's management or its general business operations.  29 C.F.R.

541.200(a)(2), Nt.  In determining what is a "primary duty" within the meaning of the regulations

pertaining to the administrative exemption, the court is also guided by the principles contained in

---

[3]Before the regulatory amendments, AEP would have had to satisfy a "short test" for
employees earning not less than $250 per week.  See Schaefer v. Indiana Michigan Power Co.,
358 F.3d 394, 400 (6th Cir. 2003) (citing to former regulations 29 C.F.R. §§ 541.2 and 541.214).
The test contained in the new text of the regulations does not differ in substance from the "short
test."

29 C.F.R. § 541.700, Nt., which provides in pertinent part as follows:

> (a)  To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work. The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

### a.  **Office or Nonmanual Work**

AEP argues that the evidence is overwhelming that the technical writers' and nuclear specialists' primary duties consist of  "office" work, as opposed to "manual" work.  The regulations explain the types of employees to whom the exemptions are intended to apply as follows:

> The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line

18

> employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be.

29 C.F.R. § 541.3(a), Nt.  Considering this standard, together with the explanation of "primary duty" contained in 29 C.F.R. § 541.700, Nt., the evidence overwhelmingly confirms that the plaintiffs' primary duties consist of the performance of office or non-manual work.

Plaintiff Thomas Brown, a nuclear specialist, testified that he spent most of his time outside of the plant reactor area and described himself as a "white collar worker." Defendant's Appendix, Exhibit L at 155, 186.  Plaintiff Lloyd Dopp, a technical writer, testified that 80 to 90 percent of his time is spent in an office, and he agreed that his primary duties include nonmanual office work.  Id., Exhibit M at 70, 194-195.  Plaintiff James Fitchuk, a nuclear specialist, testified that the majority of his job is nonmanual work.  Id., Exhibit N at 279.  Plaintiff John Hylok, also a nuclear specialist, testified that he spends 40 to 50 percent of his day in his office, and the remainder "[t]alking with technicians, talking with operators, mechanics, electricians, [about] problems they may have."  Id., Exhibit O at 23.  Plaintiff Edward Jones, a technical writer, testified that his work was "predominantly" "deskwork" consisting of research performed in front of a computer screen.  Id., Exhibit P at 170-171.  Plaintiff David Kosonovich, a nuclear specialist, testified that he worked "fifty-fifty, maybe a little more in the field" between an office and the plant, although he confirmed that his job was primarily nonmanual.  Id., Exhibit Q at 38, 44.  Plaintiff James Murtha, a nuclear specialist, testified that he spent 40 to 50 percent of his day in an office, and the remainder of the time "in the shop with the electricians or in the supervisor's area . . . or out in the plant," although he agreed that he was not a manual laborer and spent only

19

five percent of his time doing "hands-on manual" labor.  Id., Exhibit R at 107-109.  Plaintiff James Parker, also a nuclear specialist, testified that his job is primarily mental work as opposed to manual work, and that he spends more time in the office than he does in the field.  Id., Exhibit S at 130-131.  Plaintiff Robert Piehl, a technical writer, testified that his work is nonmanual; he spends 90 percent of his time in his office and performs no labor as a craftsman.  Id., Exhibit T at 19, 30, 65.  Plaintiff William Southworth, also a technical writer, testified that he spends about 50 percent of his time in an office, and the remainder out in the field or in other parts of the plant, talking with other crafts, getting material, doing "walkdowns on the equipment" to see how other equipment will be affected by a procedure which he is writing.  Although Southworth estimated that about 20 to 25 percent of his work is "hands-on," this is to help him understand a procedure; his major tools are "pen, pencil, computer, paper" and also reference manuals and research texts. Id., Exhibit V at 129, 378-379.

The only evidence plaintiffs have cited which contradicts the general "50 percent" guideline involves one plaintiff alone –  nuclear specialist Kosonovich.  Plaintiffs argue that Kosonovich "estimates that he spent up to 60% of his time actually performing tests on equipment in the technicians' work area and in the field."  Plaintiffs' Revised Response at 17. However, the evidence to which plaintiffs cite in support of this argument does not confirm their position.  Kosonovich did testify that he spent approximately 40 percent of his time actually at his desk, 20 percent with the engineers, and the remaining 40 percent in the field.  Plaintiffs' Exhibit 5 at 38-39.  However, he confirmed that only about 20 percent of his time was spent doing actual hands-on labor.  Id. at 43.  He also confirmed that his job was primarily nonmanual. Id. at 44.

20

Notwithstanding the scant evidence to support their position, plaintiffs argue that they perform so much manual work that they cannot qualify as administrative employees. However, the regulations recognize that an exempt administrative employee may perform manual work by an employee, so long as the employee's "primary duty" remains the performance of non-manual work. See 29 C.F.R. § 541.700(a), Nt. and 541.703(a), Nt. Because the evidence clearly shows that plaintiffs' duties primary duties consist of office or non-manual work, the court flatly rejects plaintiffs' argument that they perform "so much" manual work that they do not qualify for the administrative exemption.

### b. Directly Related to Management Policies or General Business Operations

To meet its burden on this element of the test for administrative exemption, AEP must also show that plaintiffs' primary job duties are "directly related to the management or general business operations of the Cook plant." 29 C.F.R. 541.201(a), Nt. According to 29 C.F.R. § 541.201(a), Nt., the exemption requires an employee to "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line[.]" Section 541.201(b), Nt. also explains that the phrase "[w]ork directly related to management or general business operations includes, but is not limited to," the following:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

21

With respect to both the technical writers and nuclear specialists, the court concludes that the decision in Renfro v. Indiana Michigan Power Co., 370 F.3d 512 (6th Cir. 2004) provides the most helpful guidance.   Renfro involved another category of employee at the Cook plant, the planners, whose claims were addressed earlier in the present action.  Like the planners at issue in Renfro, both the technical writers and nuclear specialists perform the type of "servicing" of the business that the FLSA deems administrative work directly related to AEP's general business operations.  Id., 370 F.3d at 517-518.  Plaintiffs service AEP's business insofar as their primary duties are ancillary to the Cook plant's production of electricity.  See Reich v. John Alden Life Ins. Co., 126 F.3d 1, 10 (1st Cir. 1997) ("servicing a business" entails "employment activity ancillary to an employer's principal production activity") (citing Martin v. Cooper Elect. Supply Co., 940 F.2d 896, 904 (3d Cir. 1991)).

Technical writer Dopp testified that the procedures which he writes provide "technical support" to the maintenance group, giving them with "important instructions on how to do their work and guidelines."  Defendant's Appendix, Exhibit M, at 145.   Dopp, who is responsible for developing and revising all electrical maintenance procedures, further testified that the purpose of this task is to service the electricians by providing them with work instructions which are easy to follow so that they may perform more efficiently.  Id. at 149, 158.  Although senior technical writer Piehl does not write procedures but instead spends the majority of his time either responding to or screening condition reports, Defendant's Appendix, Exhibit T, at 142, Piehl testified that his job requires him to both investigate condition reports and develop proposed responses, including proposed corrective actions, and to screen new condition reports and make

recommendations as to the significance and departmental assignment.  Id. at 157.  Piehl also

agreed that his work requires him to execute and carry out policy established by management.  Id.

at 142.  Although their jobs differ, both Dopp and Piehl service AEP's business by assisting with

the running of the plant, as opposed to working on producing power.  Their activities clearly

place them within the administrative exemption.  See Cowart v. Ingalls Shipbuilding, Inc., 213

F.3d 261, 267 (5th Cir. 2000) (production planners, who were responsible for planning in detail

all production work requirements and ensuring that adequate information was provided to craft

workers to enable them to meet contract requirements, fell within administrative exemption).

### 3.  Discretion and Independent Judgment

To meet its burden on the final element of the test for administrative exemption, AEP

must also show that plaintiffs' primary duties include work requiring the exercise of discretion

and independent judgment.  The regulations also provide guidance regarding this element.  As 29

C.F.R. § 541.202, Nt. explains,

> (a)  To qualify for the administrative exemption, an employee's primary
> duty must include the exercise of discretion and independent judgment with
> respect to matters of significance. In general, the exercise of discretion and
> independent judgment involves the comparison and the evaluation of possible
> courses of conduct, and acting or making a decision after the various possibilities
> have been considered. The term 'matters of significance' refers to the level of
> importance or consequence of the work performed.

> (b) The phrase 'discretion and independent judgment' must be applied in
> the light of all the facts involved in the particular employment situation in which
> the question arises. Factors to consider when determining whether an employee
> exercises discretion and independent judgment with respect to matters of
> significance include, but are not limited to: whether the employee has authority to
> formulate, affect, interpret, or implement management policies or operating
> practices; whether the employee carries out major assignments in conducting the
> operations of the business; whether the employee performs work that affects

business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

In addition, section 541.202(e), Nt. distinguishes the exercise of discretion and independent judgement from the use of skill in applying techniques, procedures, or specific standards:

> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. See also § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

Section 541.202(a), Nt. also emphasizes that "the discretion and independent judgment exercised" must be exercised "with respect to matters of significance."  However, employees can exercise discretion and independent judgment "even if their decisions or recommendations are reviewed at a higher level[,]" so long as they have "authority to make an independent choice, free from immediate supervision."  29 C.F.R. § 541.202(c), Nt.  In addition, 29 C.F.R.§ 541.202(c), Nt. further explains that the term "discretion and independent judgment"

> does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is

24

not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

An employee may be exercising discretion and independent judgment even when he is required to follow manuals, guidelines, or other established procedures; the question is whether the guidelines constrain the employee to the degree that they prevent him from exercising independent judgment.  29 C.F.R. § 541.704, Nt.; see also Haywood v. North Amer. Van Lines, Inc., 121 F.3d 1066, 1073 (7th Cir. 1997); Reich, 126 F.3d at 14; Copas v. East Bay Municipal Util. Dist., 61 F. Supp.2d 1017, 1041 (N.D. Cal. 1999).  It should be emphasized, in this regard, that the employee's "*primary duty*" must include the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200(a)(3), Nt. (emphasis supplied).

 Applying this guidance, the court concludes that AEP has failed to either show or raise a genuine issue of material fact regarding whether the work of the technical writers, including plaintiff Piehl, requires them to exercise discretion and independent judgment as part of their primary duties.  Although the evidence suggests that the technical writers perform their tasks relatively free of supervision, it does not support a conclusion that they have the authority to make independent decisions or even recommendations on matters of significance.  Indeed, much of the job involves knowing where to find the correct information to use in a procedure, as from source documents.  In addition, because the technical writers who write procedures are required to adhere to AEP's prescribed format and style for procedure writing, the technical writer's task--

25

whether it involves the drafting of a procedure or the review of another writer's work product--allows little room for variation in matters of substance.  Instead, it involves application of specialized knowledge of both the procedure for procedure writing itself and of how to locate the correct source information.  The choices these employees make are extremely limited and do not involve matters of significance.

Even with respect to Piehl, who performs different duties than the remaining technical writer plaintiffs, the evidence shows that Piehl's duties do not differ to such a degree that the court must reach a different conclusion.  Although Piehl, unlike the other technical writers, does not write procedures and does engage in some problem-solving, the evidence fails to indicate that his primary duties require him to exercise discretion and independent judgment.  Instead, the evidence suggests that Piehl merely utilizes his knowledge and skills to either screen and categorize condition reports, or to respond to the reports following an electronic format.  His work appears to be far more akin to that described in the regulations as that which involves the mere use of skill in applying techniques or standards.  See 29 C.F.R. § 541.202(e), Nt.  Because AEP has failed to meet its burden of proof on this element of the administrative exemption as to Piehl or any of the other technical writers, the court cannot conclude as a matter of law that AEP properly classified them as exempt administrative employees.

The evidence shows that in contrast with the technical writers, the nuclear specialists exercise independent judgment and discretion on matters of substantial importance.  Working with a fair degree of autonomy, the nuclear specialists identify and initiate solutions to highly complex problems at the plant, deciding what information to gather and whom to consult in addressing a problem.  They also advise other employees on code requirements, and play an

important role in the plant's fulfillment of its licensing obligations.  Because AEP has met its

meet its burden on this and the other elements of the administrative exemption as to as to the

nuclear specialists, and because plaintiffs have not created a genuine issue of material fact

regarding whether these elements, the court concludes as a matter of law that AEP properly

classified the nuclear specialists as exempt administrative employees.


**B**

**Professional Exemption**

Regarding the nuclear specialists, AEP argues that they also fall within the FLSA's

recognized exemption for "professional" employees under 29 U.S.C. § 213(a)(1).  Although the

court sees no necessity to address this argument insofar as it has already concluded that AEP

properly treated the nuclear specialists as exempt administrative employees, the court will briefly

discuss the applicability of the professional exemption to these employees.

The minimum salary requirement of $ 455 per week also applies to the professional

exemption.  29 C.F.R. § 541.300(a)(1), Nt.  Under that test, the term "employee employed in a

bona fide professional capacity" under § 13(a)(1) of the FLSA is defined to mean any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per
> week (or $380 per week, if employed in American Samoa by employers other than
> the Federal Government), exclusive of board, lodging, or other facilities; and

> (2) Whose primary duty is the performance of work:

>> (i) Requiring knowledge of an advanced type in a field of science
> or learning customarily acquired by a prolonged course of specialized intellectual
> instruction; or

>> (ii) Requiring invention, imagination, originality or talent in a
> recognized field of artistic or creative endeavor.

27

29 C.F.R. § 541.300(a), Nt.  In addition, under 29 C.F.R. § 541.301(a), Nt., in order to qualify for

this "learned professional" exemption,

> an employee's primary duty must be the performance of work requiring advanced
> knowledge in a field of science or learning customarily acquired by a prolonged
> course of specialized intellectual instruction. This primary duty test includes three
> elements:
>
> > (1) The employee must perform work requiring advanced knowledge;
> >
> > (2) The advanced knowledge must be in a field of science or learning; and
> >
> > (3) The advanced knowledge must be customarily acquired by a prolonged
> > course of specialized intellectual instruction.

The regulations define the phrase "work requiring advanced knowledge" as meaning

> work which is predominantly intellectual in character, and which includes work
> requiring the consistent exercise of discretion and judgment, as distinguished from
> performance of routine mental, manual, mechanical or physical work. An
> employee who performs work requiring advanced knowledge generally uses the
> advanced knowledge to analyze, interpret or make deductions from varying facts
> or circumstances. Advanced knowledge cannot be attained at the high school
> level.

29 C.F.R. § 541.301(b), Nt.  The phrase "field of science or learning" is further defined as

including

> the traditional professions of law, medicine, theology, accounting, actuarial
> computation, engineering, architecture, teaching, various types of physical,
> chemical and biological sciences, pharmacy and other similar occupations that
> have a recognized professional status as distinguished from the mechanical arts or
> skilled trades where in some instances the knowledge is of a fairly advanced type,
> but is not in a field of science or learning.

29 C.F.R. § 541.301(c), Nt.  Finally, the regulations explain that the phrase "customarily acquired

by a prolonged course of specialized intellectual instruction"

restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

29 C.F.R. § 541.301(d), Nt.

AEP argues that the nuclear specialists are exempt professionals because they are doing the same work as degreed engineers, most of these plaintiffs are college-educated, and they perform tasks which require a high level of skill in math, science, and engineering.  However, as best as the court has been able to determine based on the evidence provided, most of the seven nuclear specialist plaintiffs do not have college degrees, and only one – Kosonovich – has a Bachelor of Science degree in engineering.[4]  In addition, all of them appear to have acquired most of the knowledge and/or skill they use in their jobs from work experience.  Although AEP

_____

[4]Brown has a Bachelor of Science, but not in engineering; his studies focused on math and physics. Defendant's Appendix, Exhibit L, at 16-17. Murtha has an Associate's Degree in electronics. Id., Exhibit R, at 54. Parker has some sort of a college degree, although it is unclear what he studied. Id., Exhibit S, at 7. Fitchuk had some technical school training and completed two community college courses. Declaration of James Fitchuk (attached as Exhibit 9 to Plaintiff's Revised Response), at 1-2, ¶ 3. Hylok attended college for a period of time but did not obtain a degree. Declaration of John Hylok (attached as Exhibit 7 to Plaintiff's Revised Response), at 2, ¶ 3. As for Post, his educational background is unclear.

argues that the regulations permit persons who "have gained their knowledge by home study and experience" [AEP's quote - Defendant's Brief in Support at 61] to qualify as exempt professionals, this language does not actually appear in the amended version of 29 C.F.R. § 541.301(d), Nt.  Instead, the new text contemplates that the learned professional exemption will only apply to non-degreed individuals on an "occasional" basis, where the individual has "substantially the same knowledge level" *and* "perform[s] substantially the same work as the degreed employees," and has "attained the advanced knowledge through a combination of work experience and intellectual instruction."  Id. ("the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry").[5]   The regulation also expressly states that the learned professional exemption "does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction."  Id.  Even though the nuclear specialists do perform some work which may be performed by degreed engineers, based on the evidence provided, the court cannot conclude as a matter of law that AEP has shown that the nuclear specialists fall within the FLSA's exemption for professional employees.

_____

[5]The authority which AEP cites in support of its argument that the nuclear specialist plaintiffs may qualify as exempt professionals, Leslie v. Ingalls Shipbuilding, Inc., 899 F. Supp. 1578 (S.D. Miss. 1995), does not make a compelling case for the company's position.  In Leslie, an engineer was deemed an exempt professional despite his failure to receive a bachelor's degree.  However, the facts of that case indicate that the plaintiff left college "shortly before receiving" an engineering degree.  In addition, the plaintiff's job description specified that the usual minimum qualifications for his job were a bachelor's degree in an engineering discipline and 10 years of experience, and indeed most of those holding plaintiff's position had either an engineering degree or an advanced degree.  899 F. Supp. at 1582.  These same facts are not present here.

## C

## Affirmative Defenses

In their own motion for partial summary judgment, plaintiffs argue that they are entitled to judgment in their favor as a matter of law on several of AEP's affirmative defenses. These include a "good faith" defense to liability under section 10 of the FLSA, and the defenses of laches, waiver and estoppel, failure to mitigate, and failure to exhaust administrative remedies. In support of their motion, plaintiffs argue that AEP has failed to identify any basis for its assertion of these defenses.

Because the court has concluded as a matter of law that AEP properly classified the nuclear specialists as exempt administrative employees, the court finds no necessity to address the issue of AEP's affirmative defenses as to these plaintiffs. However, the court's opposite conclusion as to the technical writers presents a different issue.

In its brief in response to plaintiffs' motion, AEP does not even discuss the affirmative defenses challenged by plaintiffs; thus, it has pointed to no facts which raise a genuine issue as to the validity of these defenses. Under the circumstances, the court is hard-pressed to deny plaintiffs' motion for summary judgment disposing of the affirmative defenses of good faith under section 10 of the FLSA, laches, waiver and estoppel, failure to mitigate, and failure to exhaust administrative remedies. Therefore, plaintiffs' motion for judgment on these defenses as to the technical writers will be granted.

31

## Conclusion

For the foregoing reasons, the court orders as follows:

1.  AEP's motion for summary judgment is DENIED with respect to the technical writers and GRANTED with respect to the nuclear specialists.

2.  Plaintiffs' corresponding motion for partial summary judgment is DENIED with respect to the nuclear specialists and GRANTED with respect to the technical writers, both as to the issues of liability and affirmative defenses.

3.  The following nuclear specialist plaintiffs are dismissed from this action: James Fitchuk, Thomas Brown, John Hylok, David Kosonovich, James Murtha, James Parker, and Dale Post.

Entered this 25th day of January, 2005.


 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge